Case No. 24-2321. Please stand by. All right, please proceed. Slightly more dry of a subject, but. Don't you never know both.  Good morning, your honors. My name is Miriam Tauber, and I represent the plaintiff shareholder in this 16B case. With me is my co-counsel, David Lopez. The defendant in this case, Mr. Gad, is a 16B insider as the founder and former CEO of the nominal defendant of YMABS Therapeutics, Inc. Mr. Gad, at the time in question, owned shares of YMABS directly and through his wholly owned LLC, Gad Enterprises, which is the co-defendant in this case. At the time, he also owned shares of WG Biotech, Inc. Unlike Gad Enterprises, WG Biotech, Inc. was not a entity controlled by Mr. Gad. Rather, it was a Danish company controlled exclusively by Mr. Gad's friend and fellow YMABS board member, Mr. Johan Wedel Wedelborg. And WG Biotech, in turn, owned shares of YMABS, the company in question. In the transaction at issue in this case, Mr. Gad acquired the shares of YMABS that WG Biotech owned in exchange for his WG Biotech shares. The district court held that this exchange was not a 16B purchase because the transaction did not present the opportunity for speculative abuse. And alternatively held that the exchange was exempt under SEC Rule 16A.13, which applies when there is a change only to form of beneficial ownership. I want to focus on the opportunity for speculative abuse as that is the focus of Mr. Gad's argument on appeal. First and foremost, 16B is a strict liability statute. The absence of speculative abuse is a test of exclusion, not of inclusion from the statute. In other words, the plaintiff doesn't have to show speculative abuse, which is presumed by the fact of short swing trading. It is the defendant's burden to show that the transaction does not present the opportunity for speculative abuse such that it should be exempt. Now, this court developed the test for determining, sorry, to take it back. The reason the defendant claims that the court should analyze opportunity for speculative abuse at all is because this transaction involves what is termed a borderline or not straightforward cash for stock transaction. This court developed the test for determining when borderline transactions do not present the opportunity for speculative abuse. And that test is the unorthodox transaction exemption established in Kern County versus Occidental Petrol. That exemption has two requirements. The transaction must be involuntary and the insider cannot have access to non-public information. In Donahue versus Tannenbaum, which this court decided last year, the court emphasized the importance of both requirements and particularly the unavailability of access to non-public information and emphasized that both requirements are the defendant's burden to prove. Now, the second requirement, the unavailability of access, effectively means that the unorthodox transaction exemption is only available to 10% owners and potentially only to hostile 10% owners, which is the only context in which this court has applied the exemption. And it is not available to directors and officers or what the court has termed garden variety insiders who have undisputed access to non-public information. Ms. Tapper? Yes. Would you agree that even if we were to agree with you, perhaps with respect to your arguments related to the unorthodox transaction exception, that Shafala's alternative reliance on 16A13 would be enough on appeal? Okay, so I will vote for... Is that correct? Well, you can do whatever you want. Do you agree with that? Well, no. I mean, I'll get to that, but I guess I would say that the reason that Mr. Guy claims this transaction presents an opportunity with respect of abuse is that he claims this transaction is effectively moving shares from one pocket to another pocket, which is also the reason the court held that the Rule 16A13 exemption applies. So your view, and you may be right, is that 16A13 reflects some of these policy concerns that you have been describing. Is that right or is that wrong? Yes, I think that's right, but I would also say that the key issue with 16A13 and also the reason that the opportunity with respect to abuse is presented in this case is because even though he claims that it's moving shares from one pocket to another, he only controls one of the pockets, which is the recipient pocket. He doesn't control the transferring pocket. So there was some testimony, as I understand it, in which JWW, I can never remember how to call it, but there was some testimony that appears to be unrebutted, that in fact he had investment control over the other pocket, to use your term. Sure. And that appears to be unrebutted, and I grant you that it appears to be somewhat at odds with the language of one of the agreements, but can you address that for me? Yes, I can. In short, it doesn't matter what the witness says, the contract says. The contract is the only evidence of what the contract says. So the witness is recalling what he thinks the contract said, but it's not what the contract says. So I guess I would say under rules of evidence, you know, the best evidence rule. Are you saying that the testimony for purposes of summary judgment was inadmissible? Did you make that argument? I believe we did make that argument. I think I also said that the parole evidence rule. I don't recall that argument in your appellate brief, but okay. Okay. I can go and check the briefing, but I'm pretty sure I made that argument, but I also think we said that the parole evidence would preclude that testimony. Would you agree, understanding your objections to the testimony and your view that it constitutes a form of inadmissible extrinsic evidence given the contract, but would you agree that if that testimony were accredited, then that would be a reason to affirm? In other words, that Judge Feiler may have a point that the 1613 exemption fits here. Well, the other point I'd make about that is that Judge Feiler was quoting a provision of the contract, which when she said that there was some control, that dealt with control over the WG biotech shares and not over the YMAB shares that WG biotech owned. So she put a provision that said that shareholders had the right to sell and control the sale of their WG biotech shares, but it said nothing about their right to control any of the YMAB shares that WG biotech owned, which they had no control over at all. So I would say that, but I also would say that to the extent that the deponent, who I believe was a CFO of WG biotech, misunderstood what the contract said or believed the contract to say something that it did not say, that would be irrelevant, whether inadmissible or irrelevant to what the contract in fact says, which is that Mr. Wadelsberg had exclusive control in the WG biotech. I thought it was two people, the accountant, whose name I can't remember, and JWW. The accountant is Mr. Olaf Mermin. I don't believe that Mr. Wadelsberg testified to the control. I believe Mr. Mermin was the person who said that, but I don't think that's material for my argument, which is that the contract itself is the governing document. I'll leave the rest of my time for rebuttal. So you've reserved two minutes for rebuttal. We'll hear from Mr. Prosser. Thank you. Good morning. May I please support? I'm Sean Prosser, and with me is my colleague Amanda Asaro. We represent the appellee, Thomas Gadd. I'll just jump to the exemption discussion since we've been discussing it with the appellant. The investment control bid is a little bit of a red herring because it's not required under the exemption under 16A13. What's required is a change in the form of beneficial ownership without changing the pecuniary interest in the securities. And the court concluded that Mr. Gadd beneficially owned the Wymad shares both before and after the March 2021 transaction had issued. A beneficial owner is someone who has directly or indirectly has shares, has an indirect or direct pecuniary interest. And pecuniary interest requires an opportunity to profit. That's all. So Mr. Gadd always had an opportunity to profit from the Wymad shares held by WG Biotech. Under the agreement, he was entitled- That was indirect control. Indirectly, correct. So pecuniary interest can have direct or indirect opportunity to profit from any of the securities. And here, Mr. Gadd had the opportunity to compel 100% of his pro rata ownership in WG Biotech of any profit that it made from selling Wymad shares. He could compel that distribution to himself. As well, the agreement provided that any dividends that Wymads paid to WG Biotech are then distributed, 33% can be distributed to Mr. Gadd. So that's what's required. The investment control discussion is under a safe harbor section. It's a different section of Rule 16. It's 16A1A23. That doesn't necessarily apply here. But even if it did, Mr. Gadd did have some investment control. He had the right to sell his WG Biotech shares. And by doing that, the new owner- I thought he was affirmatively arguing that he didn't have any power, that JWW completely controlled WG Biotech. That's correct. But they argued that this other exemption applies. And so if that other- or that safe harbor applied. And we didn't ask for the safe harbor. But if it did, there is evidence that he had some degree- So you're not seeking the safe harbor? That's correct. That's correct. I'll go back a little bit to the beginning. I think the one point that the appellant sort of misses is Mr. Gadd founded WG Biotech. And he contributed his shares into- or, I'm sorry, he founded YMABS. And he contributed shares into WG- YMABS has his friend, as I understand it, and contributed his shares to WG Biotech under the control, to use that word, of his friend. That's correct. So they both contributed shares into WG Biotech. Mr. Wettelsberg controlled the entity. He founded the entity. Why would you do that? You know- What is the purpose of this? Mr. Wettelsberg, through his company, was putting a million dollars into essentially a startup company in 2015. I don't know this for a fact, but I believe he wanted some type of control over all the shares that Mr. Gadd had, and sort of to facilitate sort of a joint development of the YMABS therapeutic cancer drugs. So he deposited those shares into WG Biotech. I think what's important is that the agreement that formed WG Biotech, the shareholders' agreement, specifically ties the YMABS shares- What's the advantage for Mr. Gadd? Well, Mr. Wettelsberg was an important board member, was an important investor in YMABS. So it's to facilitate an ongoing collaborative event with this important investor. We know that a stock-for-stock transaction can be a purchase, correct? Correct. So what is there about this one that makes it not a purchase? I think what's important is it isn't necessarily a stock-for-stock. It is an exchange where Mr. Gadd receives back the YMABS shares that had always been tracked to him internally in the share registers at WG Biotech. Consistently throughout the history, from 2015 all the way through 2021, it was a 50.1 to 1 exchange ratio. But all the other investors were gone by the time this transaction took place. So basically you've got two people in a room deciding what the terms are. They could have decided to do it on the basis of 50.2, couldn't they? In theory, but the record reflects that consistently throughout, 50.1 was the exchange. And that that also applied to the other investors when they left in 2019. But they left. They were gone. So it just had two people. Those two people could have decided on any ratio, couldn't they? I think... I mean, there was nobody to... there's no contractual... there's nobody to complain about it. I guess, theoretically, someone could have done something, but that's not the test. What we look at is what really happened. And what the record was that the same exchange ratio was agreed to and consistently applied all the way through. And that Mr. Wettelsberg, not Mr. Gadd, controlled that decision. He controlled the decision when he wanted Mr. Gadd out, just like with the other investors. And then he applied the consistent ratio that everyone benefited from. He didn't force Mr. Gadd out, could he? Yes, he could. He could cause the exchange. And that's exactly what he did. And in this instance, he wanted Mr. Gadd out. But he wanted Mr. Gadd out, like, two years before the transaction took place. What I'm trying to make is the fact that when the transaction took place, YMAP shares were at low ebb. They were at their lowest price it ever reached. Well, I mean, two things. One, there is no evidence in the record that the price had anything to do with the exchange or the timing of the exchange. But the price is in the record. Right. But, I mean, I would just think logically that, you know, as an investor, why would I want these spun out to me and Mr. Gadd when they're at an all-time low or at a very low price? It's sort of counterintuitive, I would think. Well, that assumes, right, no change in beneficial ownership and the cost of this transaction. So let me ask you something. In your brief, and maybe I've misunderstood something terribly, you concede, you agree that Mr. Gadd is not entitled to the unorthodox transaction exception. That's correct. Because I think that what the test is, is that you go through what the court decided in at-home. The at-home case where the parties exchange shares without regard to price and extinguish each other's interest. And that's what happened here. And it was done pursuant to a preset formula. So like in at-home where there was a preset formula for the derivatives, there was the same formula here, the 50.1 to 1 exchange. And under DiLorenzo, the quote, steel partners, where that type of a transaction doesn't fall plainly within 16b, where there's just an open market purchase or something that's so obvious. Those cases should be interpreted consistent with the legislative purpose. And that analysis can go two ways. One, it could go with what they say the Kern County approach. But that doesn't apply here because Mr. Gadd was what the courts called a garden variety insider. He had access to inside information. So the other approach, as described in at-home, requires the analysis of whether the transaction presents a risk of the abuse that 16b tries to. My understanding of at-home, but maybe it's incorrect, is that it's largely focused on derivative transactions. Is that right? I think it definitely involved derivative transactions. But to me, what the important part of that is, it was a fixed, there were fixed terms. The terms were fixed. And here, the terms were fixed. So that's the involuntariness aspect. Correct. Correct. And the court, I think, really thoroughly worked through the analysis and looked at the factual record and concluded there was no risk of abuse of Mr. Gadd's insider position at YMAPS. The transaction was involuntary. It was controlled by Mr. Wettelsberg. Mr. Gadd had no control over the timing. The terms had been set six years earlier in terms of the exchange ratio. So, I mean, I think about this as Mr. Gadd received back six years later what he had contributed in 2015 pursuant to a set formula. What enforced that 50.1 ratio? I do understand when you have other investors, then everybody needs to be treated alike and nobody's going to engage in the investment. But once they're all gone, it's just WGG and JWW and Mr. Gadd. And I'm not sure I understand what bound them at that point to the 50.1 ratio. That was the agreement, and that's what was reflected in all the documentation in the record. That's what was reported in terms of those holdings. The beneficial ownership was consistently reported by Mr. Gadd in his SEC filings, so the public was aware. So he represented this number of shares of WGBiotech, represented times 50.1 of YMAB shares. And those shares were beneficially reported to the SEC. If somehow that exchange ratio just was blown up, he then would have to correct his filings. It would mislead the market. Did WGBiotech have assets other than YMAB shares? It did not. It was only for essentially a holding company for YMAB shares for YMAB investors. So the judge's decision that this does not constitute a purchase under 60B because there wasn't a risk of this speculative abuse, that's consistent with this court's decision in the Seychelles matter in 2014 where there was a preset formula. It's consistent with the Lorenzo case. It's consistent with Steele Partners. And there's the HUPPE, I don't know if I pronounced it right, H-U-P-P-E case in 2012 that followed this same at-home analysis where the Kern case did not apply with the unorthodox transaction. Thank you very much. Thank you. Thank you, Your Honors. Just to address the question of why they would have done this given their YMAB shares to WGBiotech back in 2015, it's because this was pre-the IPO of YMABs. And the two, this is my, obviously I don't know, but my understanding from the documents in the case is that prior to the IPO, Mr. Gad wanted people to sell his interest in YMABs, but he couldn't because the stock was not registered. There was no IPO yet. And so by doing it through this Danish company, he could then sell the WGBiotech shares to his friends and family, make money that way, but there was no sale of the unregistered securities since that was just owned by WGBiotech. That is why I believe this transaction occurred back in 2015. Why shouldn't we agree with Judge Feller that the 50.1 ratio, 50.1 to 1 ratio is the basis on which the parties were dealing from the beginning. And since WGBiotech had no other assets but YMAB shares, that that is the, that was the preordained exchange. And therefore, that determined, that is the price. I would absolutely agree if the 50.1 ratio were in the contract, if they had a right to exchange their, for example, if WGBiotech shareholders had the right to exchange their WGBiotech shares for 50.1 shares of YMABs at any time, I would agree this is a conversion. However, that's not what they had. They, first of all, had no obligation to exchange their. It looks like what they had. Well, it looks like, so it looks like the ratio never changed. But, so I will say that that could be true if there was never any, any exchanges or transactions, or if there was never any additional WGBiotech shares issued at all, right? That could be true. So, but it happens to have been true only because Mr. Wittelsburg determined to keep it that way. There was a transaction where he decided to give more YMAB shares to WGBiotech and issue more WGBiotech shares to himself. And he determined to do that at a ratio that maintained that 50.1 ratio. But he didn't need anybody's consent for that. He could have done anything he wanted. He could have issued less WGBiotech shares or more WGBiotech shares, which would have changed the ratio. On summary judgment, was there any evidence that, on this record, that suggested that he not only could have, but that he didn't need anything else to change the ratio? Well, so there's evidence that he unilaterally engaged in this transaction and that he maintained that ratio. But he didn't need anybody's consent for that transaction. There was an agreement. There was an agreement. The agreement says nothing about, the only thing that has this ratio in the agreement is that it just says, it's implied. It says the number of shares that each party contributes and the number of outstanding shares. So maybe I'll reframe the question and ask you, is there anything that suggested on the record that that ratio was pretextual? The ratio, so I will answer that by saying that this court has held in analytical surveys versus Tonga, for example, that you don't look at what actually happened, in contrast to what my opponent said. You actually look at what could have happened. It's a theoretical, right? Because it's the possibility of speculative abuse. The statute is aimed at preventing not just the actuality of abuse. No, no, no. I've got an agreement. I could break it. But the agreement is very strong evidence that this is the way that it's supposed to happen. Right. And if there's a constant ratio, then unless there's something else in the record that shows that the ratio, the agreement is a sham, that it's a pretext. I'll be very clear. There is no ratio in the agreement. There's, the agreement just says that Mr. Badal-Badal's board controls all of the YMAP shares that WGBiotech owns. This is the number of shares that it owns, and this is the number of shares of WGBiotech that are outstanding. Now, in the registers, there's evidence that ratio did not change, right? Yes. But it could have changed, and it could have changed solely at Mr. Rettelsberg's discretion. That's what the agreement says, that Mr. Rettelsberg has exclusive sole control, can do anything he wants, does not need the consent of the WGBiotech shareholders to issue more WGBiotech shares, which alone would have changed the ratio. Even if he didn't buy and sell YMAP stock, if he'd only just issued 10 more WGBiotech shares, which he indubitably had the right to do, the ratio changes for everyone. There's nothing that protects them with that ratio in the agreement. So, even though that would have been a nice fact for the defendants, because it would have been able for them- If more shares had been issued, though, the ratio would have been changed, but it would have been changed, as you argue it, based on the arithmetical difference. I mean, you would be able to calculate it if you had more math than I do. Sure, you could always- And you would end up with another ratio. Exactly, that's my point. The ratio was not constant, right? It could have changed at Mr. Rettelsberg's whim. But if the ratio changed under the circumstances you were describing, it would mean that Mr. Gad's interest would have changed as well. It would have meant his percent interest would have changed in WGBiotech, sure. The percent represented by the shares that he put into WGBiotech. No, the percent is represented by the number of WGBiotech shares. So what he would have gotten out of it in a transaction based on the recalculated ratio would be predetermined as well, correct? There's always a ratio, right? In any LLC, right, you know the LLC's assets or the corporation's assets, and you know how many shares you have. So you could always calculate, right, how many-what the value of your interest is based on what the assets of the-right? If the company owns 100 shares- But you're arguing that it is a fixed ratio that could be changed to another fixed ratio, and I think that's consistent with what your adversary is arguing. No, I'm saying the ratio is inherently not fixed. It happened to have remained at 30, 50, whatever he said, 50.2 or 30.2, whatever it was. But that's only because of the decisions or lack of-inactions or actions that Mr. Riddlesburg took, right? If Mr. Riddlesburg had issued additional shares, some of the ratio would have been-now it's not 50.1, now let's say it's 45, okay, whatever it is, right? So in that situation, now instead of getting 50.1 YMAB shares, he would have gotten only 45 YMAB shares for each of his WGBiotech shares. So the ratio is not fixed. It's different based on what Mr. Riddlesburg decides to do. There's nothing that fixes it and gives him the right to always have 50.1 YMAB shares is what I'm saying. All right. I think we've got the argument. Well, I thank you very much. We'll reserve the decision.